UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JAMES COREDERO**

                Plaintiff,

    v.

**SOLGEN POWER LLC** and **VERITY
CREDIT UNION,**
                Defendants.

Case No. 3:23-cv-01701-MO

OPINION AND ORDER


**VERITY CREDIT UNION,**

                Third-Party Plaintiff,

    v.

**LOANHOMI, LLC** fka **VOLTANA
INDIRECT INC,**

                Third-Party Defendant.


**MOSMAN, J,**

    This matter comes before me on Defendant's Motion to Compel Arbitration and Stay Proceedings ("Mot.") [ECF 33]. At oral argument, I provisionally granted Defendant's Motion and requested supplemental briefing regarding the applicability of a recent Supreme Court case, *Coinbase, Inc. v. Suski et al.*, 602 U.S. 143, 151 (2024). Mins. of Proceedings [ECF 45]. For the reasons below, I expand and make final my provisional oral ruling, and I GRANT Defendant's Motion.

1 – OPINION AND ORDER

## BACKGROUND

On November 18, 2021, Defendant Solgen Power LLC, a solar energy company, approached Plaintiff James Cordero, resident of Multnomah County, Oregon, to solicit the sale of residential solar powered equipment. First Amended Complaint ("FAC") [ECF 27] ¶¶ 3, 7. After spending forty-five minutes with a Solgen representative learning about its solar power system, and without researching or consulting other solar companies, Mr. Cordero entered into an agreement with Solgen—the Purchase and Installation Agreement ("PIA")—in which Mr. Cordero agreed to buy and Solgen agreed to sell solar powered equipment for $47, 795.45. Declaration of James Cordero ("Cordero Decl.") [ECF 38] ¶ 3; PIA [ECF 25] Ex. 1, at 1, 3.

According to the PIA, the contract price was due upon signing. PIA [ECF 25] Ex. 1, at 1. Because Mr. Cordero was unable to pay the contract price at signing, the PIA allowed him to obtain third-party financing either from the institution of Mr. Cordero's choice or through Solgen's third-party lender. *Id.* at 4. A little over a month after entering the PIA, Mr. and Mrs. Cordero entered into another agreement with Solgen—the Retail and Installation Agreement ("RIA"). RIA [ECF 25] Ex. 3, at 1. In this contract, Solgen agreed to sell and assign its rights under the PIA to Verity Credit Union—a third-party lender. *Id.* at 3. In return, Mr. and Mrs. Cordero agreed to pay the PIA's contract price, with an annual credit fee of 3.99%, according to a payment schedule. *Id.* at 1. The RIA includes a section for "Truth in Lending Disclosures" but does not include a forum selection provision. *Id.* at 1.

Unlike the RIA, the PIA includes a forum selection provision—an arbitration provision. PIA [ECF 25] Ex. 1, at 6. The PIA's arbitration provision states "[a]ll disputes arising out of or relating to this Agreement shall be resolved by either mediation or binding arbitration in accordance with the rules of the American Arbitration Association under construction industry

rules." *Id.* The arbitration provision is underlined in boldface and set apart in its own section—Section 10. *Id.* According to Mr. Cordero, Solgen neither informed him of this provision nor provided him with a copy of the AAA rules at the time of entering the PIA. Cordero Decl. [ECF 38] at 6.

The installation of the solar powered system took significantly longer than Mr. Cordero expected, and, on November 16, 2023, Mr. Cordero filed a complaint alleging Solgen: 1) failed to provide required disclosures under the Truth in Lending Act, and 2) made intentional misrepresentations in connection with the PIA. Compl. [ECF 1] ¶¶ 16, 21. Initially, Mr. Cordero's claims arose solely under the PIA and did not specify the amount of punitive damages sought. Compl. [ECF 1] ¶¶ 8, 13, 22. After Solgen answered the complaint and moved to compel arbitration, Mr. Cordero amended his complaint to allege unconscionability and seek $1,000,000 in punitive damages. FAC [ECF 27] ¶¶ 15, 24. Mr. Cordero also amended his complaint to reflect that the RIA "taken together with the Purchase and Installation Agreement . . . violate state and federal consumer protection statutes." *Id.* ¶ 15. According to Mr. Cordero, the RIA was not included in his original complaint because he was not aware of the RIA before filing this lawsuit. *Id.* Solgen then re-filed this Motion to Compel Arbitration and Stay Proceedings. Mot. [ECF 33].

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Arbitration agreements are thus "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. By its terms, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct parties to proceed to arbitration on issues as to which an arbitration agreement has been

signed." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir. 2000). The court therefore must first decide what issues the parties have agreed to arbitrate. *Coinbase,* 602 U.S. at 148.

Generally, the issue of arbitrability is for judicial determination. *Knapke v. PeopleConnect, Inc.,* 38 F.4th 824, 831 (9th Cir. 2022). An issue is arbitrable when a valid agreement to arbitrate exists and the agreement encompasses the dispute at issue. *Chicron Corp,* 207 F.3d at 1130. A court may, however, find the parties agreed to arbitrate the predicate issue of arbitrability. *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 586 U.S. 63, 69 (2019). That is, they agreed to have an arbitrator decide whether a valid agreement to arbitrate was formed. *Id.* This requires "clear and unmistakable" evidence of an intent to do so. *Id.* In cases where two contracts govern the dispute— one delegating questions of arbitrability to an arbitrator and the other "either explicitly or implicitly sending arbitrability disputes to the courts"—a court must decide which contract governs before delegating the question of arbitrability. *Coinbase,* 602 U.S. at 152.

## DISCUSSION

Solgen moves to compel arbitration on the grounds that the PIA delegated the threshold question of arbitrability to an arbitrator and, thus, I need not decide any issues of contract validity before submitting this case to an arbitrator. Mot. [ECF 33] 6-9. Alternatively, Solgen argues that, even if the question of arbitrability is for judicial determination, Plaintiff's claims must be submitted to an arbitrator because they are within the scope of the arbitration provision. *Id.* at 9-10. Before I can decide on the merits of Solgen's motion, I must first address the argument raised by Mr. Cordero at oral argument—that *Coinbase* requires me to decide which contract governs this dispute. Transcript of 09/24/2024 Oral Argument ("Tr. 9/24/24") [ECF 47] at 35:4-39:15.

## I.    The Applicability of *Coinbase*

In *Coinbase*, the Supreme Court considered whether a court or an arbitrator should decide the arbitrability of a contract-related dispute when two contracts govern the dispute. 602 U.S. at 145. The two contracts at issue in *Coinbase* included 1) a "User Agreement" for a cryptocurrency exchange platform, which delegated questions of arbitrability to an arbitrator, and 2) a "sweepstakes" contract, which contained a forum selection clause delegating sole jurisdiction to California courts to resolve disputes arising from the sweepstakes promotion. *Id.* at 146-47. The Court concluded that "where parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Id.* at 152.

It is undisputed that Mr. Cordero and Solgen have agreed to two contracts—the PIA and the RIA—in connection with Mr. Cordero's purchase of solar powered equipment. Nevertheless, unlike in *Coinbase* in which the sweepstake's contract conflicted with the User Agreement by implicitly sending arbitrability disputes to the court, the RIA does not explicitly or implicitly conflict with the PIA. *Cf. In re Axos Bank Litigation*, 2024 WL 4195299, at *7 (S.D. Cal. Sept. 13, 2024) (rejecting application of *Coinbase,* even though the parties agreed to two contracts, because one contract did not have a forum selection provision, so the court was "therefore, not being asked to choose between two conflicting agreements"). The PIA contains a provision delegating the question of arbitrability to an arbitrator, but the RIA is silent with respect to forum. Without conflicting forum selection provisions, I find that *Coinbase* does not apply, and I need not decide which of the two contracts governs this dispute. I will therefore consider whether the PIA's arbitration provision requires me to submit this dispute to an arbitrator.

## II.    The PIA Delegates Arbitrability to an Arbitrator.

Generally, I must decide whether a dispute is arbitrable before sending it to arbitration. Solgen argues, however, that the PIA's incorporation of the American Arbitration Association Construction Industry Arbitration Rules ("AAA Rules") constitutes "clear and unmistakable evidence" of the parties' agreement to arbitrate arbitrability and, thus, an arbitrator, not me, should decide whether this dispute is arbitrable. Mot. [ECF 33] at 8.

Solgen's argument hinges on whether the holding in *Brennan v. Opus Bank,* 796 F.3d 1125 (9th Cir. 2015) extends to facts present in this case. In *Brennan*, the court found that an arbitration agreement's incorporation of the AAA Rules constituted clear and unmistakable evidence that the "sophisticated" contracting parties agreed to arbitrate arbitrability. 796 F.3d at 1130. The court in *Brennan* limited its holding to the facts present in the case—an arbitration agreement involving "sophisticated" parties—but did not "require that the contracting parties be sophisticated" or "foreclose the possibility that this rule could also apply to unsophisticated parties or consumer contracts." *Id.* at 1130-31.

The PIA's arbitration provision incorporates the AAA Rules but, unlike the agreement between sophisticated parties in *Brennan*, the PIA is a consumer contract with at least one unsophisticated consumer—Mr. Cordero. Nevertheless, Mr. Cordero provides no authority to suggest we should, in fact, treat cases on this issue involving consumer contracts and unsophisticated parties differently from those involving sophisticated parties. By contrast, most circuits that have held that the incorporation of the AAA Rules constitutes clear and unmistakable evidence of the parties' intent to delegate the arbitrability to an arbitrator have done so without looking to the sophistication of the parties. *See, e.g., Petrofac, Inc. v. DynMcDermott Petrol. Operations Co.,* 687 F. 3d 671, 675 (5th Cir. 2012); *Fallo v. High-Tech Institute,* 559 F.3d

874, 880 (8th Cir. 2009); *Terminix Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327, 1332-33 (11th Cir. 2005); *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d. Cir. 2005); *see also Blanton v. Domino's Pizza Franchising LLC,* 962 F.3d 842, 851 (6th Cir. 2020) (rejecting the argument that incorporation of the AAA rules is not clear and unmistakable evidence of parties' intent to delegate arbitrability when one party is unsophisticated); *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 104 (3d Cir. 2020) (same).

Given that *Brennan* explicitly left open the possibility that its rule could apply to unsophisticated parties, I agree with the guidance from other circuits that we should not distinguish between sophisticated and unsophisticated parties when applying this rule. A party to an arm's length transaction—whether sophisticated or unsophisticated—can look out for their own interest. Here, the arbitration clause was set out separately and in boldface. It would infantilize Mr. Cordero to suggest that he could not read and understand the plain language of the arbitration clause and make his own decision whether to agree to such a contract. Accordingly, I find that the PIA's incorporation of the AAA rules constitutes clear and unmistakable evidence of Solgen and Mr. Cordero's intent to delegate arbitrability to an arbitrator, and that an arbitrator, not me, should decide whether Mr. Cordero's claims are arbitrable.

### A. Mr. Cordero Does Not Adequately Challenge the Validity of the Delegation Provision.

When parties clearly and unmistakably delegate arbitrability questions to the arbitrator, "the only remaining question is whether the particular agreement to delegate arbitrability—the Delegation Provision—is itself unconscionable." *Brennan*, 796 F.3d at 1132; *see Rent-A-Center*, 561 U.S. at 72-73 (refusing to consider unconscionability challenges to an arbitration agreement as a whole because the parties agreed to delegate arbitrability, and the plaintiff did not challenge the validity of the specific delegation provision). Mr. Cordero's only validity challenges go to the

PIA and Arbitration Provision as a whole, not the validity of the specific delegation provision. Because the parties agreed to arbitrate arbitrability, I find that Plaintiff's remaining validity challenges are properly left for an arbitrator to decide. I therefore GRANT Solgen's Motion and submit Mr. Cordero's claims to an arbitrator.

### III.    Even if Mr. Cordero Adequately Challenged the Validity of the Delegation Provision, the PIA's Arbitration Provision Is Not Unconscionable.

Mr. Cordero's failure to challenge the delegation provision ends my analysis. For the sake of thoroughness, I will address Mr. Cordero's unconscionability challenge to the PIA's arbitration provision. Because Mr. Cordero does not dispute that his claims fall within the scope of the PIA's arbitration provision, his claims are arbitrable if the arbitration provision is valid and not unconscionable.

Arbitration is a matter of contract, and, therefore, the validity of arbitration agreements is governed by ordinary state law principles that govern the formation of contracts. *First Options of Chi. v. Kaplan*, 514 U.S. 938, 944 (1995). Although the PIA includes a choice-of-law provision, which provides that the agreement will be "governed and constructed under the laws of the State of Washington," PIA [ECF 25] Ex. 1, at 6, the parties have agreed to apply Oregon law. Tr. 9/24/2024 [ECF 47] at 3:23-4:8. As such, I will consider Mr. Cordero's unconscionability challenge under Oregon law.

"Under Oregon law, unconscionability is determined based on the facts as they existed at the time the contract was formed." *Sprague v. Quality Rests. Nw., Inc.*, 213 Or. App. 521, 525 (2007). While both procedural and substantive unconscionability are relevant to the analysis, only substantive unconscionability is absolutely necessary. *Id.* at 525-26. The party asserting unconscionability bears the burden of demonstrating the arbitration clause is unconscionable. *Id.*

at 525. Mr. Cordero argues that the PIA's arbitration provision is both procedurally and substantively unconscionable. Response to Motion for Stay ("Resp.") [ECF 36] at 12-16.

### A. Procedural Unconscionability

Procedural unconscionability refers to the conditions of contract formation, specifically conditions of oppression and surprise. *Sprague*, 213 Or. App. at 525. Mr. Cordero conceded at oral argument that he did not face conditions of oppression when entering the PIA. Tr. 9/24/2024 [ECF 47] at 29:20-25. Instead, Mr. Cordero argues that he was unfairly surprised by the arbitration provision because it was hidden in the electronic agreement, and he was not provided with a copy of the AAA Rules. Resp. [ECF 36] at 13-14.

For purposes of unconscionability, surprise does not depend on whether a contracting party was subjectively surprised by any one of the contract's terms but rather whether the agreed upon terms were in some objective sense hidden. *See Sprague*, 213 Or. App. at 525-26. Courts consider objective factors, such as whether a contract's terms are hidden or disguised, not a party's mental state, to find unfair surprise. *See id; Motsinger v. Lithia Rose-Ft, Inc*., 211 Or. App. 610, 616 (2007). Oregon courts have routinely rejected arguments of unfair surprise where arbitration agreements are not hidden but clearly expressed and set apart by boldface or italics in a contract. *Sprague*, 213 Or. App. at 526 (finding an arbitration agreement that was clearly set apart in a contract by boldface was "no more unconscionable that the typical employment, consumer, or service contract that are a common feature of contemporary commercial life"); *see Gist v. ZoAn Mgmt. Inc*., 305 Or. App. 708, 717 (2020); *see also Motsinger*, 211 Or. App. at 616.

Contrary to Mr. Cordero's assertion, the PIA's arbitration provision was not hidden within the electronic agreement. Instead, the PIA's arbitration provision was clear and set off in its own underlined and boldfaced section, like the clearly expressed boldface arbitration agreements that

have consistently been upheld in Oregon. *E.g.*, *Sprague*, 213 Or. App. at 525; *Gist*, 305 Or. App. at 71. While Mr. Cordero may have been subjectively surprised by any one of the AAA Rules underlying his agreement to arbitrate, it would create the wrong incentive to allow Mr. Cordero to agree to bind himself to the AAA Rules and then later claim that he was surprised by any one of its rules. I thus find that there was no unfair surprise in the existence of the PIA's arbitration provision, and that Mr. Cordero has not met his burden in proving procedurally unconscionability.

### B. Substantive Unconscionability

Substantive unconscionability focuses on the one-sided nature of substantive terms. *Sprague*, 213 Or. App. at 525. Mr. Cordero argues that the cost of arbitration renders the PIA's arbitration provision substantively unconscionable. Resp. [ECF 36] at 15-16.

Before addressing Mr. Cordero's argument, it is important to note that there is an artificial element to the cost of arbitration on which Mr. Cordero relies. The fees under the AAA Rules depend in part on the dollar amount at issue. *See* "Construction Industry Arbitration Rules and Mediation Procedures Administrative Fee Schedules," Aм. Arb. Assoc., https://go.adr.org/constructionfeeschedule. Mr. Cordero maintains that, in light of his alleged $1 million in punitive damages, the minimum cost to arbitrate his dispute is $16,750. Resp. [ECF 36] at 15-16. However, Mr. Cordero's initial Complaint alleged approximately $75,000 in damages. Compl. [ECF 1] at 8. Only after Solgen moved to compel arbitration did Mr. Cordero amend his Complaint to allege $1 million in punitive damages. FAC [ECF 27] at 11-12.[1] Because Mr. Cordero drove up his own costs by adding substantial punitive damages, I will rely on the AAA filing fee

---

[1]Mr. Cordero's alleged punitive damages, which exceed thirteen times his claim for compensatory damages, likely exceeds constitutional bounds. *See Vasquez-Lopez*, 210 Or. App. at 581-2 ("[A] punitive damage 'award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.'") (quoting *State Farm Mut. Auto Ins. Co. v. Campell*, 538 U.S. 408, 425 (2003)).

for claims between $75,000 and $150,000, which is $1,925, to consider whether the PIA's arbitration provision is substantively unconscionable.

The existence of large arbitration costs may render an arbitration agreement unenforceable if it denies a litigant's opportunity to vindicate his or her rights. *Vasquez-Lopez*, 210 Or. App. at 573. In *Vasquez-Lopez*, a cost-sharing provision rendered an arbitration agreement substantively unconscionable because the cost of arbitration was equivalent to six months of plaintiff's savings and was "sufficiently onerous to act as a deterrent to plaintiffs' vindication of their claim." *Id.* at 574; *cf. Gist*, 305 Or. App. at 720 (rejecting a substantive unconscionability challenge to the cost of arbitration because the record was not complete as to the cost of arbitration or the deterrent effect that the cost would have on a plaintiff's ability to vindicate his rights).

Mr. Cordero declares that $16,750 is beyond his means and would preclude him from bringing this action. Cordero Decl. [ECF 38] ¶ 6. However, even when presented the opportunity at oral argument, Mr. Cordero did not argue, or provide any evidence, that a $1,925 filing fee would preclude him from bringing this action. *Cf. Vasquez-Lopez*, 210 Or. App. at 574. Even if a $1,925 filing fee was a substantial burden for Mr. Cordero, the AAA rules provide that it may "in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." AAA Rules [ECF 25] Ex. 2, at 35. On this record, it is therefore not clear whether the cost of arbitration under the AAA rules would preclude Mr. Cordero from vindicating his rights. *See Gist*, 305 Or. App. at 720 ("When the fee provisions themselves are not onerous and when plaintiff's factual information is incomplete, we cannot rely on speculation to declare arbitration costs unconscionable."). As such, I find that Mr. Cordero has not met his burden in proving the arbitration provision is substantively unconscionable. Further, I find that Mr. Cordero's claims are arbitrable because 1) the arbitration agreement is not unconscionable, and 2) the parties do not dispute that Mr. Cordero's

claims fall within the scope of the arbitration provision. I therefore GRANT Solgen's Motion and submit Mr. Cordero's claims to an arbitrator.

## CONCLUSION

For the reasons discussed above, Defendant's Motion to Compel Arbitration and Stay Proceedings [ECF 33] is GRANTED. The proceedings are STAYED pending the outcome of arbitration.

IT IS SO ORDERED.

DATED this ⎽⎽11⎽⎽th day of December, 2024.

MICHAEL W. MOSMAN
Senior United States District Judge